57 N.J. Super. 53 (1959)
153 A.2d 854
THE NATIONAL STATE BANK OF NEWARK, ET AL., PLAINTIFFS-RESPONDENTS AND CROSS-APPELLANTS,
v.
LUCILLE NADEAU, NOW KNOWN AS LUCILLE BENNETT, ET AL., DEFENDANTS-APPELLANTS AND CROSS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued April 13, 1959.
Decided July 23, 1959.
*58 Before Judges GOLDMANN, CONFORD and FREUND.
Mr. Harry Dvorken argued the cause for defendants-appellants and cross-respondents, residuary legatees Evelyn Fluet et al.
Mr. Willaim Howe Davis argued the cause for defendant and cross-respondent Lucille Nadeau (Bennett) (Messrs. Howe & Davis, attorneys; Mr. Thomas A. O'Callaghan, on the brief).
Mr. Milton M. Unger argued the cause for defendant-respondent and cross-appellant Annette Nadeau, executrix of Dorilas Nadeau (Messrs. Milton M. and Adrian M. Unger, attorneys).
Mr. Marshall Crowley argued the cause for defendant-respondent and cross-appellant R. Arthur Nadeau, individually (Messrs. Toner, Crowley, Woelper & Vanderbilt, attorneys; Mr. Robert A. Matthews, on the brief).
*59 Mr. Israel B. Greene argued the cause for plaintiffs-respondents and cross-appellants, The National State Bank of Newark et al., executors (Mr. Murry Brochin, on the brief).
The opinion of the court was delivered by GOLDMANN, S.J.A.D.
The executors of the estate of Ross Nadeau brought a Chancery Division action seeking construction of certain terms of decedent's will and also approval of their accounting. The residuary legatees appeal from that part of the final judgment determining that the residuary estate must pay administration expenses as well as the New Jersey transfer inheritance tax which the widow, a beneficiary under the will, would have had to pay but for testator's instruction that she be exonerated therefrom. Testator had designated his son Arthur and his brother Dorilas as specific legatees; Arthur and Dorilas' executrix cross-appeal from the determination that they must contribute to the federal estate tax in amounts proportional to their benefits under the will. The executors also cross-appeal, challenging that part of the judgment which awarded less than the full amount of the commissions they requested.
Ross Nadeau died a resident of this State on July 24, 1953, leaving a will dated May 4, 1953 and duly admitted to probate. Surviving him were his widow Lucille Nadeau (now Bennett) and his son by a former marriage, R. Arthur Nadeau. The net estate amounted to about a million dollars.
By paragraph Second of this will testator left one-half of his adjusted gross estate, as finally determined for federal estate tax purposes, to the widow. His obvious purpose was to take full advantage of the marital deduction formula in section 812 of the Internal Revenue Code of 1939 (26 U.S.C.A.), now section 2056 of the 1954 Code, 26 U.S.C.A., which permits one-half of a decedent's taxable estate to pass tax-free to his surviving spouse. See In re Kantner's Estate, 50 N.J. Super. 582, 587-588 (App. *60 Div. 1958). Clearly underscoring that intention, he declared in paragraph Second:
"* * * It is my intention hereby to give to my wife the maximum value in property, but no more, that may be deducted from my estate as the marital deduction under the applicable Internal Revenue Code. * * *"
By paragraph Third testator bequeathed all his stock in Club Razor & Blade Manufacturing Corporation (a privately held corporation in which he held a two-thirds interest) in equal shares to his son Arthur and brother Dorilas, directing that the bequests "shall be construed as specific legacies."
By paragraph Fourth the residue of the estate was devised and bequeathed in equal shares to ten named beneficiaries, one an employee and the others relatives of decedent.
In addition to the property which passed under the will, testator had two life insurance policies, one payable to the widow, who eventually received $61,922.69, and the other to Arthur, who received $16,645.92. These amounts were included in computing the gross estate for federal tax purposes.
Paragraph Sixth of the will contains the language that has led to the present controversy over the payment of taxes charged against the estate. It reads:
"I direct that my wife as legatee and devisee under this will, and as transferee of any property outside of this will, or as beneficiary of any proceeds of life insurance on my life, and of any annuity policy purchased by me, shall not be liable and shall not be called upon to reimburse my estate for any portion of the Federal estate taxes or New Jersey inheritance taxes on property which may constitute part of my gross estate, it being my intention that she shall have all of said property, insurance proceeds and annuity entirely tax free.
As to all other legatees and devisees hereunder and beneficiaries under life insurance on my life, there shall be an apportionment of said taxes, in accordance with the laws of the State of New Jersey."
The will named Arthur, John F. McNamee (a friend and business associate), and The National State Bank of Newark, *61 N.J., co-executors. They duly qualified. Their account covers the period July 24, 1953 to October 10, 1957.
We shall first consider the tax apportionment questions raised, and then the issue of executors' commissions.

I.
Under the marital deduction arrangement adopted by testator, the widow's share of the estate is by hypothesis exempt from federal estate tax. But it is not exempt from our state transfer inheritance tax. Since the latter is a succession tax, laid directly upon the transfer of property under the will rather than upon the estate itself, the widow would normally be required to pay it. Turner v. Cole, 118 N.J. Eq. 497 (E. & A. 1935); Goldman v. Goldman, 2 N.J. Super. 412 (Ch. Div. 1949); Case v. Roebling, 42 N.J. Super. 545 (Ch. Div. 1956). Here, however, testator in the first section of paragraph Sixth expressly directed that she be exonerated from payment  a direction which all parties agree is fully effective to accomplish its purpose. The question is, who shall pay the state tax? Is it to be apportioned among the residuary beneficiaries and the two specific legatees, or paid from the residue, the specific legacies remaining unabated unless and until the residuary estate is exhausted?
The second tax apportionment question concerns the federal estate tax which must be borne by the estate, but it raises essentially the same problem. Shall the residuary estate, to the extent of its capacity, be charged with the entire federal tax, or should it be apportioned among all the beneficiaries, except the widow?
We deal with the federal estate tax issue, since its resolution sheds light upon the state transfer inheritance tax question.
The federal estate tax is imposed upon the estate as a whole. A testator may, of course, place the ultimate burden of the tax wherever he chooses by the terms of his will. *62 With two exceptions the question of whether a testator has, by his will, shifted the tax burden or whether the tax should be imposed as provided by law is for determination by the courts of the state of his domicile. Riggs v. Del Drago, 317 U.S. 95, 63 S.Ct. 109, 87 L.Ed. 106, 142 A.L.R. 1131 (1942); Hale v. Leeds, 28 N.J. 277 (1958). (The two exceptions relate to powers of appointment (26 U.S.C.A. § 2207) and to the proceeds of insurance policies on decedent's life (26 U.S.C.A. § 2206).) Under Riggs, the Federal Government is not concerned with the distribution of the tax among the testamentary beneficiaries; its only interest is that the tax be collected.
In the absence of an expressed intention by the testator to the contrary, the law of this State is that the tax is payable in the same manner as are other debts and administrative expenses  from the residuary estate. Turner v. Cole, above, 118 N.J. Eq. 497 (E. & A. 1935). A contrary testamentary instruction will, however, be given effect. Morristown Trust Co. v. McCann, 19 N.J. 568 (1955).
Turning to paragraph Sixth of the will, we find testator's main intention clearly expressed in the first section: his widow is to pay no estate taxes whatever, state or federal. Directly following this, testator in the second section declares that as to all other legatees and devisees under the will, as well as beneficiaries of insurance policies on his life, "there shall be an apportionment of said taxes." Had the paragraph ended with these words there would have been no problem, for it would then have been clear that testator was directing an apportionment of the federal tax among the residuary legatees and the two specific legatees of the Club Razor & Blade stock. But he continued and said, "in accordance with the laws of the State of New Jersey." Since, under New Jersey law, there is no apportionment of federal estate taxes as to property passing under a will, in the absence of a direction to that effect, N.J.S. 3A:25-30, 31, 33, the second section of paragraph Sixth poses a seeming contradiction.
*63 The assumption is, of course, that testator intended all his words to have some meaning, and none to be mere excess verbiage. It is our function to reconcile, if possible, the apparent contradiction in this language so as to invest it with a consistent and reasonable meaning, and thereby give effect, as best we can, to the testamentary intention. Greene v. Schmurak, 39 N.J. Super. 392, 401 (App. Div. 1956); Brooks v. Goff, 127 N.J. Eq. 115, 118 (Ch. 1940).
The Chancery Division judge construed the closing words of paragraph Sixth, "in accordance with the laws of the State of New Jersey," as being merely testator's way of indicating that he was exercising a power granted him under our statutes. That is, he was saying, "The laws of New Jersey give me the power to direct an apportionment, and I hereby exercise that power."
While this view on the surface saves the construction below from the condemnation of treating the clause mentioned as surplusage, the explanation is not a satisfactory one. Although the words, "in accordance with the laws of the State of New Jersey," might conceivably serve a useful purpose in a situation where the law is unclear and the draftsman wants to underscore the fact that certain language is being used in a strict legal rather than in a lay sense, no such problem exists here.
It has long been settled that a New Jersey testator has the power to direct apportionment of the federal tax to be levied on his estate. See, e.g., Gaede v. Carroll, 114 N.J. Eq. 524 (E. & A. 1933); Morristown Trust Co. v. McCann, above, 19 N.J. 568. That power unquestionably existed when the will was drawn, as any experienced scrivener would well know. The Nadeau will is a carefully drawn instrument, fully exposing the testamentary pattern and reflecting an appreciation of estate problems. We perceive no reason why a draftsman as skilled as the one who prepared the will before us would want to state the obvious fact that the testator had the very power he had just exercised in the clause immediately preceding the words under consideration. *64 This, together with the fact that the words used would not normally convey the meaning the trial judge ascribed to them in his attempt to reconcile what appeared to be a contradiction, leaves us unconvinced, upon a reading of the entire will, that this is what the testator actually intended.
We find the argument advanced by the specific legatees and the executors far more persuasive. Their position is that the direction for apportionment contained in the second section of paragraph Sixth means that there should be apportionment only to the extent that New Jersey law, exclusive of any express testamentary direction, demands it. Thus, the state transfer inheritance tax would be "apportioned." (We recognize that this is not a strictly accurate statement of the effect of our Transfer Inheritance Tax Act, since that tax is levied directly on the transfer of property, and is by its very nature "apportioned" among the beneficiaries.) Also applicable would be the provisions of N.J.S. 3A:25-30, 31 and 33, which, in the absence of a testamentary direction to the contrary, require apportionment of the federal estate tax attributable to property which does not pass under the will but is nevertheless included in the adjusted gross estate for federal tax purposes. The insurance benefits payable to testator's son Arthur is an example of such property. (Arthur concedes that he must pay the federal tax attributable to these monies.)
The executors and the specific legatees insist that it is only the state transfer inheritance and federal estate taxes attributable to property not passing under the Nadeau will that were to be apportioned in accordance with New Jersey law. The testator intended and directed this apportionment, and nothing more. In other words, they contend that the words he used were merely a shorthand reference to the laws of New Jersey. Where the law called for apportionment there was to be apportionment; where it said no apportionment, there was to be none.
*65 This argument quite naturally raises the question of why testator said anything, rather than merely letting the law take its course. The executors' answer is that the words "in accordance with the laws of the State of New Jersey" were intended to "negate any inference of presumptive intent which might otherwise have been drawn from the other parts of the will under the state of the law as it existed when the will was executed * * *." They point out that under the artificial rules of construction prevailing prior to the decision in Morristown Trust Co. v. McCann, 19 N.J. 568 (decided in 1955; the will was executed May 4, 1953), the direction that the widow be relieved of all succession taxes might well have been considered, in the light of the maxim expressio unius, exclusio alterius, as manifesting an intention to subject all other legatees to the burden of paying their respective shares of federal and state taxes, including estate taxes which otherwise would be paid out of the residue. See Gaede v. Carroll, above, 114 N.J. Eq., at pages 533-534 (E. & A. 1933); Commercial Trust Co. of N.J. v. Thurber, 136 N.J. Eq. 471, 475 (Ch. 1945); affirmed per curiam 137 N.J. Eq. 457 (E. & A. 1946); Montclair Trust Co. v. Spadone, 139 N.J. Eq. 7, 8 (Ch. 1946). That there was, in 1953, a legitimate ground for fearing that such would be the construction given to the apportionment language of paragraph Sixth is made manifest by a reading of the cited cases.
We agree with the construction advanced by the executors and the specific legatees. It gives meaning to all the disputed language. Further, in contrast to the interpretation given by the trial court, which leaves unanswered the question why a skilled draftsman would employ completely unnecessary language, it provides a reasonable basis for his use of the disputed words and results in a substantively logical reading of the entire apportionment section. It comports with the testamentary intention to be ascertained within the four corners of the will, Morristown Trust Co. v. McCann, above, 19 N.J. at page 572, and the provisions of *66 our law relating to the payment of death taxes, N.J.S. 3A:25-30 et seq., specifically limited by its terms to property passing outside the will.
We therefore conclude that the federal estate tax, except for the proportionate amount thereof attributable to the insurance proceeds paid the son, should not be apportioned among all the beneficiaries but must be borne by the residuary estate.
We turn to a consideration of the source of payment of the New Jersey transfer inheritance tax levied on the widow's share of the estate, in view of the testator's direction that she be absolved therefrom.
The contention of the residuary legatees that the state tax should be apportioned between them and the specific legatees is based on what they consider to be the direction contained in the last sentence of paragraph Sixth that all taxes shall be apportioned. We have just concluded that this provision does not require an apportionment except where New Jersey law calls for it. The argument of the residuary legatees falls with its premise. It is entirely clear that the testator did not direct apportionment of the state tax attributable to the widow's interest. Accordingly, the tax must be treated as would any other charge against the estate. It should be paid from the residue, which must first be exhausted before any recourse can be had to the specific legacies. Turner v. Cole, above, 118 N.J. Eq., at page 502.
Although the trial judge held that the federal estate tax should be apportioned among all legatees, specific and residuary, he concluded that the state transfer inheritance tax attributable to the widow's interest must be borne by the residuary estate. In his view, the second section of paragraph Sixth, relating to apportionment, had no application to the taxes which the widow would have had to pay but for testator's direction that she be exonerated. The apportionment provision, he said, was applicable only to those taxes assessed against property passing to "all other legatees and devisees" than the widow. Since testator had given *67 no direction as to who should pay the state tax on the widow's share, it was to be borne by the residue, in accordance with prevailing New Jersey law.
We agree. Even had we concluded otherwise than we did as to the proper apportionment of the federal estate tax we would still have to hold that the state transfer inheritance tax on the widow's share should not be apportioned, but paid from the residue. Cf. Righter v. Fidelity Union Trust Co., 110 N.J. Eq. 169 (Ch. 1932); In re Deutz, 105 N.J. Eq. 671 (Prerog. 1930); N.J. Title Guar. and Trust Co. v. Smith, 90 N.J. Eq. 386 (Ch. 1919); see also Parrot v. Rogers, 86 N.J. Eq. 311 (Ch. 1916).
Our construction of paragraph Sixth, on both the points just considered, finds strong support in what we conceive to be the general testamentary plan exhibited by the will. Without question, testator's main concern was that his widow receive the maximum amount available to her, tax-free, under the marital deduction provision of the Internal Revenue Code. This is admitted by all here involved. His second main concern, as appears from the language of the will (paragraph Third) was that his principal business interest, Club Razor & Blade Manufacturing Corporation, pass on to those who were next nearest to him  his son, who was being groomed to take over the enterprise, and his brother Dorilas, who had been closely associated with him in many business ventures. This two-way legacy was expressly designated as specific. It is reasonable to believe that testator looked forward to the business being continued by these two men, although he foresightedly gave his executors full power to sell, pledge or hypothecate the Club Razor & Blade shares and to liquidate the business "for the administration of this estate and the payment of taxes." In this connection we recall that son Arthur and testator's life-long company associate, John F. McNamee, who was supervising Arthur's training, were named executors of the will.
Consideration of the entire will, and particularly paragraph Third, indicates that it was unlikely that testator *68 intended to have his son and brother, whose only substantial legacies were the shares in this corporation, pay a portion of the federal estate tax, or the state transfer inheritance tax levied on the widow's share. Had this indeed been his intention he must have realized that he would thereby be encouraging a sale of the stock to enable the legatees to raise enough to meet taxes. The state tax concededly payable by the two men on the interests they took under paragraph Third is relatively small in comparison with the federal tax, and the tax on the insurance passing to the son could be paid from the proceeds of the policy. This limited apportionment would not be likely to frustrate the continued family operation of the business, as would the full apportionment of all taxes contended for by the residuary legatees. Testator's designation of the bequests of the stock as "specific legacies" also gives support to the conclusion that he wanted them to pass unabated, if at all possible.

II.
Ross Nadeau's gross estate was computed for federal tax purposes at $1,319,437. At the time the executors submitted their accounting, the adjusted gross estate for tax purposes  the gross estate less debts and funeral and administration expenses (Internal Revenue Code of 1939, 26 U.S.C.A., 812(e)(2); Code of 1954, § 2053)  was $943,764.91. The total income which had come into the hands of the executors was $65,847.19. This included $26,400 in net rent receipts from the Abbey Towers Apartments building which testator owned at the time of his death.
The executors requested total commissions of $56,852.46. They arrived at this figure on the basis of a commission of 7% (5% plus 1% for each of the two additional executors) on a corpus of $892,668.35, or $53,560.10, and a 5% commission on income of $65,847.19, or $3,292.36.
The trial judge included as corpus certain items in addition to those used by the executors in their calculations and fixed the total figure at almost exactly $1,000,000. *69 He then concluded that $45,000 was a fair and equitable allowance for corpus commissions. In making the award the judge commented that this amounted to about 4 1/2% of corpus, emphasizing that he was not setting the commission at that percentage but "merely using that as an indication in fixing the allowance at $45,000." He further said that ordinarily he would have awarded only $35,000, but the fact there were two additional executors who would share in the allowance had induced him to add an additional 1%.
As to the income commissions, the court allowed the 5% requested on all income except the $26,400 net rentals derived from the Abbey Towers Apartments. Inasmuch as the executors had employed a real estate agent to manage the building and paid him 5% of the gross rents he collected, the court deemed it appropriate that they receive but 2 1/2% of the net rentals he had turned over to them. Of this, more below.
Although the executors were allowed commissions amounting to approximately 84% of what they requested, they maintain that the amounts awarded them were "grossly inadequate." Further, they allege errors in the method by which the court computed the commission.
As to the commissions on corpus. N.J.S. 3A:10-1 and 2, as amended by L. 1957, c. 80, §§ 1, 2, was the statute in effect at the time of the accounting. It was therefore controlling in the circumstances. Blauvelt v. Citizens Trust Co., 3 N.J. 545, 560 (1950). Under N.J.S. 3A:10-1 allowance of commissions on corpus in excess of $100,000 is to be made with reference to the executors' "actual pains, trouble and risk in settling the estate, rather than in respect to the quantum of the estate." N.J.S. 3A:10-2 provides that where the corpus exceeds $100,000, a commission of 5% shall be allowed on the first $100,000, and on any excess above that sum "such percentage, not in excess of 5%, as the court may determine * * *, according to actual services rendered." This section also provides that if there *70 is more than one fiduciary, "the court may allow corpus commissions in excess of the commissions to which 1 fiduciary would be entitled under this section, at a rate not exceeding 1% of all corpus for each additional fiduciary." (Italics ours.)
From this it is clear that any allowance greater than the minimum of $5,000 (5% of the first $100,000 of corpus), was to be determined in the light of "actual services rendered" and with reference to the "actual pains, trouble and risk in settling the estate." The fixing of corpus commissions that will fairly compensate fiduciaries for their efforts is a matter left to the court's discretion. The allowance will be set aside only where there has been an abuse of that discretion. In re Rogers, 13 N.J. 508, 512 (1953); Ditmars v. Camden Trust Co., 10 N.J. 471, 499 (1952). We will not disturb the award unless the court below was manifestly in error, i.e., where the commission allowed, fairly considered, was grossly inadequate.
The executors have fallen far short of demonstrating that the award was grossly inadequate. Although they maintain that administration of the estate involved unusually complex problems and a considerable amount of time and work on their part, they have not provided us with anything more specific than statements that particular projects took a "great deal of time," a "number of conferences," and descriptions of equal vagueness. We shall not discuss in detail the problems referred to by the executors except to say that many of them were obviously matters for counsel, who discharged them ably and well, and who requested and received a well-earned fee of $35,000. Further, even if the administration were more difficult than what appears, we have not been shown why an award of $45,000 in corpus commissions, when the executors asked $53,560.10, should be considered grossly inadequate.
The executors also argue that the Chancery Division judge "overlooked the implication of the 1957 amendment" to N.J.S. 3A:10-2. Prior to the amendment the statute *71 provided that if there were more than two fiduciaries, the court might allow corpus commissions "in excess of 5% at a rate not exceeding 1% for each additional fiduciary." Thus, with three executors the maximum allowable commission under the statute prior to amendment was 6%.
The 1957 amendment, as noted, permits the court to add 1% for each fiduciary over one. The maximum allowable commission is now 7%. From the fact that the judge said he would normally have awarded only $35,000 in corpus commissions, but was adding 1% because there were three executors, the executors argue that he was mistakenly referring to the pre-1957 statute. Implicit in this argument is either the conclusion that the court was required to add 1% for each fiduciary beyond one, or that had the judge been aware of the amendment he would have added another 1% to the commissions allowed.
Any suggestion that N.J.S. 3A:10-2 might be construed as mandatory in this respect is patently without merit. The statute says only that the judge "may" so increase the commissions. It obviously does not require him to do so.
The argument that the trial judge was unaware of the change in the statute and would have granted an additional 1% had he known of it amounts to little more than an invitation that we join the executors in the realm of sheer speculation. The judge did not indicate that he believed he was giving the maximum additional commission because of the plurality of executors. Under the pre-1957 statute, the maximum allowance would have been 6%, and yet he awarded but 4 1/2%. There is nothing in what the judge said that would indicate he was unaware of the provisions of the recent amendment, or that he would have granted greater commissions but for an erroneous reliance on a statute no longer in effect. He made it quite clear that in awarding $45,000 he was not proceeding on a percentage basis. Only after announcing the dollar figure did he indicate that it amounted to about 4 1/2% of corpus.
*72 Further, if at the time the judge rendered his oral opinion counsel for the executors believed the court was relying on statutory provisions no longer applicable, the proper procedure was to call attention to the error then and there, rather than say nothing and subsequently seek appellate reversal on grounds entirely speculative.
We have, nonetheless, thoroughly reviewed the record to assess the quality and extent of the services rendered, their necessity, whether they were properly to be performed by the executors or were in fact the responsibility of their counsel, the risks involved, and the results achieved. We find the award of $45,000 as corpus commissions entirely reasonable and fair.

III.
The question of the executors' right to commissions on income that came into their hands is more complex. Until 1957, N.J.S. 3A:10-2 provided that executors shall receive commissions of 5% "on all income that comes into their hands, * * * without court allowance." L. 1957, c. 80, § 2, amended this section to increase the commission to 6%.
We have heretofore mentioned that in their accounting the executors charged themselves with income of $65,847.19. Of this, $26,400 represented net rental receipts from Abbey Towers Apartments; the remaining $39,447.19 came from miscellaneous sources. The executors sought commissions of 5% on the total. The court awarded them 5% of the $39,447.19 miscellaneous income, but only 2 1/2% of the $26,400 rent receipts.
Some days after the court had refused to award the full amount requested, counsel for the executors for the first time suggested that the commission on the Abbey Towers' income should be computed on the basis of the gross rentals collected by the agent, rather than the net income he had turned over to the executors. In rejecting the proposal the trial judge pointed out that to do so would, even if one were to compute the commissions on gross income *73 at 2 1/2%, give the executors a much larger commission than the 5% of net income actually requested by them. (They had sought total income commissions of $3,292.36. Their subsequent request for 2 1/2% of the Abbey Towers gross rentals of $141,823.78, when added to the 5% commission on the miscellaneous income, would give them total income commissions of $5,517.95.)
In paragraph Second of the will, testator, after giving his widow half of his adjusted gross estate, declared it to be his "intent and direction" that as part of the property constituting the marital deduction she should receive the Abbey Towers Apartments as well as the marital dwelling. He then said:
"* * * To effectuate this intention and direction, I give, devise and bequeath to my wife all my right, title and interest in and to the aforesaid real estate."
At the time of testator's death there was some doubt as to whether his estate was sufficiently large that one-half of the adjusted gross estate could include both parcels of real estate. All parties agreed that, under a proper construction of the will, if the value of these properties exceeded half the adjusted gross estate, the widow could not receive both parcels, but the devise of at least one of them would have to abate.
The widow occupied the marital residence under her statutory right of quarantine. N.J.S. 3A:35-4. To meet the problem of administering Abbey Towers until it could be ascertained whether she would receive the property, the widow agreed with the executors that they retain control of the apartment building, remit to her about half the net rents, and deposit the remainder in the general estate account. This arrangement continued for some two years, after which time it became clear that the devise would not have to abate. The property was then turned over to the widow.
To manage Abbey Towers during this two-year period, the executors retained the services of the real estate agent who had managed the property during testator's lifetime. (As *74 to their right to do so, see In re Van Riper, 90 N.J. Eq. 217, 219 (Prerog. 1919); 6 N.J. Practice (Clapp, Wills and Administration) (1950), § 504, p. 452; and see Greene v. Schmurak, above, 39 N.J. Super., at pages 405-406.) He collected the rents and from them paid taxes, repairs and employees' salaries, as well as what fell due on the mortgage. For this he received compensation of 5% of the gross rents. These totalled $141,823.78. After deducting expenses and his commission, the agent periodically remitted the net rents to the executors, and these totalled $26,400.
On their cross-appeal the executors renew their claim to income commissions based on the gross rentals collected by the Abbey Towers managing agent. Their position is that the property passed to them under the will, in trust for the widow on the condition that the devise to her need not abate; that the managing agent was their agent, and in contemplation of law the rentals he received had passed "into their hands"; that they are therefore entitled to the statutory commission on the gross amount. This argument must, of necessity, proceed on the assumption that the word "income" in N.J.S. 3A:10-2 refers to gross income, rather than net income.
The executors rely on the County Court decision in In re Emery, 14 N.J. Super. 243 (1951), which held that where a trustee collected rentals from estate properties and paid taxes, insurance premiums, repairs and maintenance expenses therefrom, he was entitled to statutory commissions on the gross rents. The opinion recognizes, however, that "executors who carry on a business of the testator are entitled to commissions on the net profits of the business and not on the gross income." (at page 246) See also, Latorraca v. Latorraca, 132 N.J. Eq. 40, 48-49 (Ch. 1942), affirmed per curiam 133 N.J. Eq. 298 (E. & A. 1943); but see In re Linn, 124 N.J. Eq. 65 (E. & A. 1938). In the Emery case the trustee personally collected the rents and made the necessary payments. This clearly distinguishes the case from the one before us.
*75 We do not deal here with a small property or two from which testator himself used to collect rents. The Abbey Towers operation was a substantial and relatively complex one, large enough to warrant the retention of a managing agent to handle all the details, from collection of rents to maintenance of the property. Testator had dealt with the situation in the same way and with the same man, and had received only net rentals, after deduction of taxes, expenses and agent's commission. So with the estate  it received from the agent only what was left of rentals after deductions. We consider that it would be a distortion of the statutory language (N.J.S. 3A:10-2), and indeed of the arrangement which actually existed, to say that the normal expenses of the apartment enterprise, paid by the manager out of gross receipts, should not first be deducted from the rentals he collected before determining "all income that comes into their [the executors'] hands."
The gross rentals could better be described as "revenue," rather than "income." Were Abbey Towers a retail store instead of an apartment house, and the executors retained the former manager to continue its operation, it could hardly be said that they would be entitled to income commissions on gross sales. Certainly salaries, cost of inventory and overhead would have to be deducted from total revenues before it could be said that there was "income" coming into the hands of the executors. The Abbey Towers situation is quite analogous. The executors dealt with it as a business of the estate, even as had their testator in his lifetime. Only the net rentals paid over to them by the managing agent could be used in calculating their income commissions.
Strong support for this conclusion is found in the fact that the executors themselves believed they were entitled to commissions on only the net rentals from Abbey Towers. Until the court handed down its oral conclusions they had never considered the gross rentals to be "income that [came] into their hands." As we have previously noted, in their accounting they charged themselves with only the net receipts *76 turned over to them by the managing agent. In the affidavit of the trust officer of the bank co-executor seeking to justify a 5% commission on income of $65,847.19, as well as in his testimony, the Abbey Towers income was consistently described as $26,400. Further, and most significantly, the executors submitted a number of alternate schedules designed to show that the commissions they were requesting were reasonable, and not the maximum they had a right to demand. In none of these schedules did they indicate that they considered the gross rentals from Abbey Towers as having come into their hands, or that they were entitled to commissions on the larger figure. If ever there was a place and time to point up such a claim, it was in the supporting affidavits, testimony and the schedules, or even as late as the hearing on the approval of the account. The fact is that nowhere in the record do we find even an indication of what the gross rentals were, until after the court had denied the executors' full request for commissions.
In view of the executors' obvious belief that they had no claim to commissions on the gross rentals, and considering that they received from the managing agent only the net after expenses, we are of the firm opinion that the only income which came into their hands from Abbey Towers was $26,400.
The executors sought income commissions of only 5%, although the statute in force at the time of the accounting, and thus controlling in this action, Blauvelt v. Citizens Trust Co., above, 3 N.J., at page 560; 7 N.J. Practice (Clapp, Wills and Administration) (1950), § 760, p. 229, entitled them to 6%. The trial court granted the requested 5%, except as to the Abbey Towers income. The executors now maintain, however, that their designation of a 5% commission on income was merely suggested as part of the method of computing the total requested corpus and income commissions of $56,852.46. Since this amount was denied them, they claim they should have been awarded the income commission to which the statute entitled them  6%.
*77 In dealing with income commissions, the trial judge said that the executors "are, of course, entitled to the statutory 5 per cent commission * * *," subject only to modification as to the Abbey Towers net rentals, on which he allowed 2 1/2%. From this it is clear that the court intended to grant the executors the full statutory commission but for the moment forgot that the current percentage was 6%. It does not appear that counsel for the executors called the court's attention to this mistake, and we would therefore be justified in denying his clients' belated claim to an additional 1% on income. However, since we are convinced that the court intended to grant the maximum, we deem it proper to increase the allowance on miscellaneous income to the statutory 6%.
As to the $26,400 net income from Abbey Towers, the court refused to award the full statutory commission because 5% of the gross rentals had already been paid to the managing agent. Instead it awarded only the 2 1/2% mentioned.
There is nothing to show that the executors in any way acted improperly in paying the agent 5% of gross rentals for his services. Nor does anyone so contend. As we have already observed, they had power to hire any employees or agents necessary to attend to the important real estate asset they were for the time being administering, and to pay them reasonable compensation for their services. The executors were not required to pay such compensation from their own pockets. In re Van Riper, above, 90 N.J. Eq., at page 219.
N.J.S. 3A:10-2 reflects a legislative policy to provide executors with quick and fixed commissions on income that has come into their hands. We see no reason to construe the statute as permitting a reduction in commissions because the executors exercised their right to engage someone to manage the Abbey Towers property. To do so would frustrate the express authority given executors by the statute to claim income commissions, even without court allowance.
*78 The case of In re Linn, 124 N.J. Eq. 65 (E. & A. 1938), referred to by the trial judge and cited to us as authority for the propriety of reducing income commissions because of moneys expended by an executor in collecting the income, was decided under a predecessor statute, L. 1898, c. 234, § 129 (later amended by L. 1937, c. 99, § 1). That law empowered the court, where income exceeded $50,000, to fix commissions at not exceeding 5%, taking into account actual services rendered. (Cf., § 128, with its reference to "actual pains, trouble and risk"; and § 130, employing the same language, with income commissions to be such as the court might deem "fair and just.") It was not until 1939 (L. 1939, c. 134) that the Legislature set income commissions at a mandatory rate (5%) and authorized fiduciaries to take such commissions out of income without first obtaining court allowance. The present law, N.J.S. 3A:10-2 is to the same effect, but the rate is 6%. The Linn case is therefore of no precedential value in the circumstances here present.
We conclude that the executors are entitled to a commission of 6% on not only the $39,447.19 miscellaneous income but also on the $26,400 net rental from Abbey Towers Apartments.

IV.
The residuary legatees contend that the judgment under review wrongly charged executors' commissions and counsel fees against the residuary estate. Their claim is that these should be paid out of the gross estate before calculation of the marital deduction. We do not understand why they consider themselves aggrieved. Analysis of their argument shows it to be without merit.
As the executors point out, the bequest to the widow was of property equivalent in value to her full marital deduction under the applicable provisions of the Internal Revenue Code. The maximum amount of that deduction equalled one-half *79 the adjusted gross estate. 26 U.S.C.A., § 812(e)(1)(H), Internal Revenue Code of 1939. The adjusted gross estate is defined, in general, as the gross taxable estate less debts, funeral and administration expenses. Ibid., § 812(e)(2). Therefore the total amount payable to the widow was here calculated by subtracting from the gross taxable estate all of the debts, funeral and administration expenses, including estimated executors' commissions and counsel fees; half the difference was the amount of the marital deduction. (In view of the allowance of commissions and additional counsel fees at the final accounting, the adjusted gross estate will have to be recomputed, in effect reducing the amount of the widow's bequest by half the additional allowances.)
The residuary estate is, of course, the amount which remains after deducting the gifts to the widow and to specific legatees, and all debts and administration expenses. Because of the nature of the widow's bequest, the amount, if any, left for the residuary legatees is reduced by half the administration expenses.
The residuary legatees seem to have confused the method of calculating the marital deduction with the source of payment of the administration expenses. The latter must clearly be paid out of the residuary estate. The amount of these expenses is one of the elements to be deducted from the gross estate for the purpose of mathematically computing the amount of the marital deduction.

V.
The residuary legatees also contend that it was not testator's intention that the residuary estate be exhausted before abatement of the specific bequests of the Club Razor & Blade stock for the payment of administration expenses or death taxes. As to estate taxes, their argument has been answered under Point II of this opinion. As to administration expenses, we find no merit whatever in the argument. The residuary legatees base their claim on the fact *80 that there is no provision in the will, either express or implied, that the residuary estate be exhausted before abatement of the specific legacies. The observation is a correct one; however, it does not support the legal result for which contended, but the very opposite. Absent contrary testamentary direction, specific legacies do not abate to pay administration expenses until the residuary estate has been exhausted. 5 N.J. Practice (Clapp, Wills and Administration) (1950), § 169, p. 392.
The judgment, as modified by our determinations hereinabove concerning apportionment of federal estate taxes and allowances of income commissions, is affirmed.